## Philip Collins *v.* Bellefonte Central R. R. Company, Appellant.

*Contract—Bailment—Rolling stock of railroad.*

By a resolution of the board of directors of a railroad company, the president was authorized to purchase certain rolling stock which was owned by a director and stockholder of the company, and was in use at the time by the company. The president and the owner subsequently entered into a written agreement for the lease of this rolling stock to the company for eight years, at an annual rental, with an option to purchase at a stipulated price at any time during the term ; and if the purchase should be made, credit was to be given for the amount of rent paid on the purchase money. The lease was not recorded.

The railroad company paid the owner rents at different dates which in the aggregate amounted to over half of the purchase money mentioned in the agreement, taking receipts therefor " on account of lease for purchase of engine and cars." After this a mortgage prior in date to the lease was foreclosed and a sale was decreed of the mortgaged property, including rolling stock. At the time of the sale notice was given of the lease of the rolling stock to the railroad company. The purchasers at the sale asserted title to the property and sold it to the defendant ; the lessor replevied it ; the defendant gave a claim property bond and retained possession.

*Held*, that (1) the resolution of the board of directors and the written lease when read together constitute a bailment, and plaintiff's title to the property was not divested by the sale under the mortgage ; (2) plaintiff could only recover money damages, and the measure of the damages was

the value of the property as stipulated in the bailment contract, mitigated by the amount of rent already paid by defendant's predecessors as shown by the receipts; (3) the fact that defendant claimed on the trial that plaintiff's title to the property was divested by the sale under the mortgage did not preclude it from proving the payments of rent in mitigation of damages; (4) defendant having given notice to plaintiff before suit brought that it would neither pay the rental nor the purchase money, the plaintiff was not bound to wait until the expiration of the period within which the defendant might exercise the right of option, but he could bring suit at once.

Argued April 22, 1895.    Appeal, No. 509, Jan. T., 1894, by defendant, from judgment of C. P. Centre Co., Aug. T., 1892, No. 282, on verdict for plaintiff.    Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ.    Reversed.

Repelvin to recover from the defendant, the Bellefonte Central Railroad Company, one locomotive engine, No. 1, lettered B. R. B. & B. E. R., with all appliances; one passenger car, No. 1, Janney coupler and air-brake; one combination passenger car, No. 2, Janney coupler and air-brake; one baggage car, No. 5, Janney coupler and air-brake; one observation car, Janney coupler and air-brake; six gondola cars, lettered Bellefonte and Buffalo Run R. R., and one hand car and one hand truck, of the value of twelve thousand dollars.

The defendant pleaded "non cepit and property." Before FURST, J.

The facts appear by the opinion of the Supreme Court.

At the trial defendant's counsel offered in evidence the duplicate of the lease between Philip Collins and the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, dated January 5, 1891, with the various receipts attached, signed by Philip Collins " on account of lease for the purchase of engine and cars," as follows:

" Memorandum of agreement made and concluded this fifth day of January, A. D. 1891, between Philip Collins, of Ebensburgh, Cambria county, and state of Pennsylvania, of the first part, and the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, a corporation existing under and by virtue of the laws of the commonwealth of Pennsylvania, of the second part.

" Witnesseth, Whereas, the said Philip Collins purchased, at

his own proper cost, amounting with interest and repairs to seventeen thousand, one hundred and eighty-five dollars and sixty-seven cents ($17,185.67) in the years 1886 and 1887, and let the same to the said party of the second part, the following described rolling stock and equipments, viz:

" One (1) two-truck, eight-wheel passenger car, No. 1, equipped with Janney couplers, air- and hand-brakes, two stoves, and fully equipped, painted Tuscan red, lettered Bellefonte & Buffalo Run R. R.

" One (1) two-truck, eight-wheel combination passenger car, No. 2, equipped with Janney couplers, air- and hand-brakes, two stoves, and fully equipped, painted Tuscan red, lettered Bellefonte & Buffalo Run R. R.

" One (1) baggage car, two-truck, eight-wheel, No. 5, equipped with Janney couplers, air- and hand-brakes, one caboose stove, and fully equipped.

" One (1) observation or excursion car, No. 14, with roof, open ends and sides, equipped with Janney couplers, air- and hand-brakes, two-truck, eight-wheel, painted Tuscan red, lettered Bellefonte & Buffalo Run R. R.

" Six (6) gondola cars, Nos. 8, 9, 10, 11, 12, 13, with draw heads and hand-brakes, painted yellow and lettered B. & B. R. R.

" One (1) four-wheel hand truck, no lettering.

" One (1) four-wheel hand car, no lettering.

" One (1) locomotive, No. 1, built by Baldwin Locomotive Works, in 1886, six-wheel connected, pony truck, Westinghouse air-brake on driver and tender, two Seller's improved injectors, painted and striped, marked B. R. B. & B. E. R. R., fully equipped.

" And Whereas, the said party of the second part has had the use and benefit of said above-described rolling stock and equipments, without any definite annual rental therefor having been fixed and agreed upon.

" Now, This Agreement Witnesseth, that for the consideration hereinafter named, the said party of the first part hereby agrees to demise and lease, and by these presents has demised and leased the above-described rolling stock and equipments, to the said party of the second part, its successors and assigns, for a period of eight years, from January first, A. D. 1887, to January first, A. D. 1895.

" In Consideration Whereof the said party of the second part, its successors and assigns, agrees to pay to the said party of the first part, his executors, administrators and assigns, an annual rental therefor of twenty-five hundred dollars ($2500) per annum, payable quarterly, at the end of each and every quarter, from January 1, A. D. 1887.

" It is also further agreed by and between the parties hereto, that the said party of the second part shall have the privilege of purchasing said described rolling stock and equipments at the end of or during the term, at the price or sum of seventeen thousand, one hundred and eighty-five dollars and sixty-seven cents ($17,185.67), with interest from January 1, 1891; and should the party of the second part purchase the same, upon or before the expiration of this lease, then party of the second part to have credit upon said price or sum, above named, at which it has the option or purchase, for the amount of rents paid. The party of the second part to keep up the repairs of said rolling stock and equipments from January 1, A. D. 1891, until the expiration of this lease.

" In Witness Whereof, the said party of the first part has hereunto set his hand and seal this fifth day of January, A. D. 1891, and the party of the second part has caused the same to be executed on its behalf by the signature and seal of the president of said corporation.

" [SEAL.] (Signed.) PHILIP COLLINS.

(Signed.) " The Buffalo Run, Bellefonte and Bald Eagle Railroad Company.

" [SEAL.] By JOHN REILLY,

"President.

" Witness : J. F. LYNCH."

The receipts attached to said agreement are as follows :

First. " Received, February 21, 1891, from the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, the sum of five thousand, five hundred and forty-five dollars and nine cents ($5,545.09), on account of lease for purchase of engine and cars, dated January 5, 1891.

" (Signed.) PHILIP COLLINS.

Second. " Received, June 10, 1891, from the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, the sum of two

thousand, one hundred and ninety-seven dollars and fifty-eight cents ($2,197.58), on account of lease for purchase of engine and cars, dated January 5, 1891.

" (Signed.)                          PHILIP COLLINS.
    Third.—

"The Buffalo Run, Bellefonte and Bald Eagle Railroad Co.,
        " Office, No. 267 South Fourth Street,
                        " Philadelphia, Pa., 12/26/1891.

" Received from the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, on the dates named on account of lease for purchase of engine and cars, dated January 5, 1891, the following:

        "1891, August 20th, five hundred dollars,
        "      September 21st, seven hundred dollars,
        "      October 19th, five hundred dollars,
        "      November 20th, six hundred dollars,
        "      December 19th, five hundred dollars,

making a total of twenty-eight hundred dollars.

    " (Signed.)                        PHILIP COLLINS."

The purpose of this offer was stated to be to present upon the record to the court and jury what the defendant conceived to be the principal data upon which to estimate and determine the damages due from the defendant in this action to the plaintiff, in case the court should be of the opinion that the plaintiff, as against this defendant, had any right to recover at all.

Plaintiff objected to the offer of testimony made by the defendant, first, because it had already denied and still denied that the plaintiff had any right to this property under the agreement referred to or independent of it; secondly, because it had not been shown in the evidence that either the Buffalo Run, Bellefonte and Bald Eagle Railroad Co. or the present defendant ever exercised the option stipulated in the agreement to purchase this property, and in the absence of the exercise of such option neither the original company, with which the agreement was made, nor the present defendant could apply the payments made to the purchase value of the property; third, the evidence under the pleadings, which on the part of the defendant were non cepit and property in itself, denied the position which it was then taking in regard to the payments made under the agreement. The pleadings themselves disaffirmed the agreement offered.

For these reasons the plaintiff submitted that the testimony certainly was irrelevant and incompetent.

By the Court: Do you offer this paper as binding upon you?

By Mr. Blanchard: We offer it as showing what the contract was between the original parties to it, so that when the court comes to consider the question of damages, in case the court should differ with us as to the question, right here we have the evidence from which the true measure of damages is to be determined on that issue.

By the Court: Under the agreement made between Philip Collins, plaintiff, and the Buffalo Run, Bellefonte and Bald Eagle Railroad Company, party of the second part, dated 5th day of January, 1891, which agreement must hereafter be construed by the court, and we avoid its construction now in this ruling, which recites that the Buffalo Run, Bellefonte and Bald Eagle Railroad had been using the property of the plaintiff for a number of years without any definite arrangement as to rental value, an agreement was concluded on the 5th day of January, 1891, in and by which the plaintiff, Philip Collins, covenanted to demise and lease unto the Buffalo Run, Bellefonte and Bald Eagle Railroad the property therein mentioned, for the period of eight years from the 1st day of January, 1887, to the 1st day of January, 1895, at the yearly rental of twenty-five hundred dollars, from the 1st of January, 1887, in sums payable quarterly; the same agreement, in its last provision declares that "during said time the said party of the second part shall have the option to purchase the property at the sum of $17,185.67, with interest from the first of January, 1891. And in case the said party shall exercise the option to purchase the property, that any payments that have been made thereon shall be applicable to the purchase price of the property." Had this defendant, the Bellefonte Central Railroad, claimed under this agreement, not disaffirmed its provisions and denied its validity, and claimed by title, not only paramount, but adverse to it, then we think the offer would be relevant to the issue. But the defendant having disaffirmed this contract declared it null and void, and that it was the owner of the title to the property by paramount title, and no evidence having been shown to the court that the Buffalo Run, Bellefonte and Bald Eagle Railroad Company exercised the option to purchase, and this

defendant not only not having exercised any option to purchase, but having denied entirely the validity of this agreement, the offer is not pertinent to this issue; because, if this offer were pertinent to the issue, then all the evidence that has been received on either side touching the value of the property would be totally irrelevant, because the agreement itself fixed the standard of value in case of the exercise of the option to purchase. And for the further reason, that if this evidence now could be received, to be sustained in our ruling, we would have immediately to say to the jury that this suit has been prematurely brought, and that the present defendant would have until the 1st of January, 1895, to elect to purchase the property, and thus under the light of the evidence that the defendant denies its liability to pay either a rental value or to pay the contract price of the property mentioned in the agreement, if the option to purchase be exercised. If the defendant had elected, therefore, to purchase the property, or had acknowledged in any way prior to the impetration of this writ, liability under this contract, then the evidence would be proper and would be received. But the evidence now offered is in disaffirmance of every position that the defendant assumed, and we therefore cannot stultify our rulings in this case by now admitting this evidence.

The copy of the agreement is admissible, because if different at all from the copy offered in evidence, the defendant would have the right to show that difference. But the receipts to that agreement are excluded. If, however, the defendant shall offer these receipts in a separate offer as evidence that the Buffalo Run, Bellefonte and Bald Eagle Railroad paid that amount of money as rental of this property, we will receive that evidence, because it would be in ratification of this agreement. At its request, a bill of exceptions is accordingly sealed to the defendant. [3]

The court charged in part as follows:

[This paper, we say to you, in law is what is termed a bailment. . . . This agreement is a bailment with an option to purchase. The railroad company has the privilege, during the continuance of this lease, to purchase this property at a stipulated price, and it was to pay quarterly a rental value at the rate of $2,500 a year until the exercise of such option; and if

it exercised the option to purchase, it would be entitled to a credit on the contract price of the amount of rental it had paid. . . . So that, under this agreement, this property was delivered in special trust or upon bailment to the railroad company, with the option on its part to become a purchaser. If it had exercised the right to purchase that property, it could have converted this bailment into a purchase, for under the agreement it must exercise that right in order to become a purchaser.] [5]

[But before the purchase was made, according to the undisputed evidence in the case on both sides, Mr. Collins gave notice to Mr. Whelen—now I don't know how many others or what others were present—of his title to this property, that the railroad company did not own this property, that it belonged to him, and on the 1st of December, on the day of sale, a written notice to the same effect was read at and before the sale, which notice was signed by the president of the Buffalo Run, Bellefonte and Bald Eagle Railroad, setting forth that Mr. Collins was the owner of that property. Whelen and Milnes and Benson purchased the property of the railroad at that sale and afterwards they conveyed the title to the Bellefonte Central Railroad Company, the defendant in this case. Their deed to the company was on the 5th of March, 1892. The present defendant corporation was organized on the 12th of January, 1892, a short time after the sale.] [6]

[Immediately after this notice, in 1891, Philip Collins went south. Robert Frazer, who is the president of the new organization and who was present when notice was given, wrote to Mr. Collins in Florida, and his letter has been offered in evidence. I have not read it, but my recollection of the contents of it is that he made an offer to purchase this property, not on the terms of the written agreement, but by paying twenty-five hundred dollars cash and five thousand dollars in stock, which was declined by Mr. Collins. Now that letter itself is wanting in evidence to show that Mr. Frazer accepted the terms of this written contract, because he makes an offer, not according to its terms, but he will pay so much in stock and so much in cash. Mr. Collins returned from Florida to Philadelphia on the 14th of April, 1892. He had an interview the following day with Mr. Frazer in Mr. Townsend's office, and, according

to the evidence in the case, Mr. Frazer informed him, substantially, that, notwithstanding what occurred between them prior thereto, he had discovered and had been advised by counsel that the Bellefonte Central Railroad Company was the owner of this property itself, and declined to negotiate with Mr. Collins for the purchase of it. This step in the case was a surprise to Mr. Collins, because that was the first notice, as he testifies, that there was any adverse claim to this property. A short time thereafter, on the 18th of August, 1892, this writ of replevin was issued. We have thus endeavored to give you a history of the transaction.

There is a slight discrepancy in the testimony between Mr. Collins and Mr. Frazer, and yet it is more in expression than in reality. Mr. Wolbert testifies that he was present at this conversation, and that Mr. Collins, speaking of that transaction, called it a sale, but he said he did hold the title as security. Well, that is not a very material difference. There was the option of sale in the agreement, but the contract of the agreement was that the title to this property should remain, under the bailment, in Mr. Collins until its terms were complied with.] [7]

[In order to pass the title at that sale (referring to the trustee's sale under the decree of the United States court in foreclosure of the mortgage of 1885), the company must acquire the property subsequently or possess it at the time. According to all the evidence in the case, the Buffalo Run and Bellefonte Railroad never acquired any title or ownership to this property ; at least the evidence fails to show any such acquisition. But a lease was made, or bailment. It is alleged by the defendant in this case that this bailment or lease is void in law, and that is the principal defense here. Opportunity was ample, if this defendant in any manner intended to affirm the terms of the bailment, to do so, but from the beginning of the trial of this case until this period in all the evidence preceding it there is not a single particle of evidence that the Bellefonte Central Railroad Company ever affirmed this lease. But all it has done has been in disaffirmance of it. It disaffirms it because of the provisions of the act of 1883, which we will read, or portions of it.] [8]

[But, with the express notice of the conditions of this agree-

ment, as provided for in the act itself, prior to the purchase, we say to you that that act of assembly does not create a bar to the plaintiff's right to recover in this case.] [9]

[We have already, in answer to one of these points, called your attention to the fact of the disaffirmance of the plaintiff's title by this defendant. When the plaintiff brought his writ of replevin on the 14th of August, 1892, he brought it, of course, at his peril; that is, if the defendant had come into court and acknowledged the plaintiff's title and that he claimed under the lease, then the plaintiff would have had to stand on just what evidence preceded the impetration of the writ to show the defendant disaffirmed the contract. But he brought his writ of replevin, and when he called upon this defendant to make its defense it comes into this court and by its plea, placed upon the record of this court, it denies his title and claims the title in itself; it claims the property, and the evidence shows it claims it not under the lease, but in disaffirmance of it. For that reason we have said to you that, if the notice was given as required by the act of 1883, the defendant's position upon that ground falls.] [10]

Verdict and judgment for plaintiff for $12,890.41. Defendant appealed.

*Errors assigned,* among others, were (3) rulings on evidence, quoting the bill of exceptions; (5–10) above instructions, quoting them.

*John G. Johnson, Ellis L. Orvis, C. M. Bower, John Blanchard* and *John S. Gerhard* with him, for appellant.—The real arrangement between Collins and the railroad company amounted to a sale, with delivery of possession, and an attempt to secure the purchase money. It was a fraud: Martin v. Mathiot, 14 S. & R. 214; Brunswick Co. v. Hoover, 95 Pa. 508; Com. v. Harmel, 36 W. N. C. 3.

It was not within the province of the court to determine whether or not the real arrangement between the parties was a fraud. It was its duty to submit to the jury the question of whether or not the agreement of January 5, 1891, was the real transaction, or was a mere cover for a sale accompanied by possession and an attempt to secure the purchase money.

The railroad company was not bound by the agreement of January 5, 1891, because, with the knowledge of Collins, it was made without proper authority: Twelfth St. Market v. Jackson, 102 Pa. 269.

The railroad company had paid $10,542.67 on account of the equipment, and to that extent it had an interest therein, which passed, by the master's sale, to the defendant: Edward's App., 105 Pa. 103.

It can hardly be denied that the word "purchaser" is to be so defined as to include a mortgagee. This is elementary. Such is the interpretation put upon the word, in a similar connection, by the courts of both England and Pennsylvania, in the construction of the statute of 27 Elizabeth, cap. 4, A. D. 1885, the act against fraudulent conveyances: Chapman v. Emery, Cowp. 179; Lancaster v. Dolan, 1 Rawle, 231; Mott v. Clark, 9 Pa. 399.

No notice given at the sale, or at any time after the lien of the mortgage had attached, could in any way affect the rights of the mortgagee: Milligan's App., 104 Pa. 503; Semple v. Burd, 7 S. & R. 285; Freedley v. Hamilton, 17 S. & R. 70; Jaques v. Weeks, 7 Watts, 261; Uhler v. Hutchinson, 23 Pa. 110; Calder v. Chapman, 52 Pa. 359; National Transit Co. v. Weston, 121 Pa. 485.

*James A. Beaver, John M. Dale* and *S. R. Peale* with him, for appellee.—The lease was a bailment and not a sale: Rowe v. Sharp, 51 Pa. 26; Enlow v. Klein, 79 Pa. 488; Ditman v. Buist, 125 Pa. 609; Brown Bros. & Co. v. Billington, 163 Pa. 76; Miller Piano Co. v. Parker, 155 Pa. 208; Com. v. Harmel, 36 W. N. C. 3.

The provisions of this act of 1883 do not in any way apply to this case: First, because the appellant is neither a subsequent judgment creditor nor a subsequent purchaser for a valuable consideration without notice. A bondholder or a mortgagee is not included within its provisions. Second, because the Buffalo Run, Bellefonte and Bald Eagle R. R. Co. expressly disclaimed title to the property in dispute in their report to the secretary of internal affairs in 1887.

The question of ownership was fairly submitted to the jury: Forrest v. Nelson Bros. & Co., 108 Pa. 481.

OPINION BY MR. JUSTICE DEAN, October 7, 1895:

In 1885, two connecting short railroads, the Bellefonte and Buffalo Run, and Nittany Valley and Southwestern, were consolidated under the name of the Buffalo Run, Bellefonte and Bald Eagle Railroad Company. Under the original grants, the new company had authority to construct and operate a railroad from Beech Creek to Bellefonte, and from thence, by way of Buffalo Run to State College in Centre county. After consolidation, the road was built from Bellefonte to State College, by a contract with Frank McLaughlin. To raise money for the construction, the new company executed a mortgage to the Fidelity Insurance, Trust and Safe Deposit Company, as trustee, to secure the payment of $600,000 in bonds to promote the work of construction. This mortgage was recorded in Centre county May 13, 1886, and by its terms, pledged the railroad then under construction, and all the rolling stock and equipment to be acquired for operating the road. All the bonds were disposed of when the road was completed; some had been sold to purchasers, others had been delivered to McLaughlin in payment for construction. McLaughlin, to facilitate the completion of the work, first borrowed from the Pennsylvania Railroad Company some rolling stock, but afterwards replaced this by a new locomotive and some construction cars purchased in his own name, and used these in completing his contract. On October 10, 1888, McLaughlin and Philip Collins, the plaintiff, entered into a written agreement, wherein, for certain considerations, McLaughlin transferred, among other things, all his interest in the rolling stock to Collins, thus describing it:

"'Fourth: All the right, title and interest of said Frank McLaughlin, in and to the locomotives, passenger cars, freight cars and rolling stock of every description used in and upon the said Buffalo Run, Bellefonte & Bald Eagle Railroad, together with the right to receive payment and make settlement for any such rolling stock which may have already been transferred to said railroad company and still remains unsettled for."

The rolling stock having thus passed to Collins, it remained in use by the railroad company. Collins was interested, as a stockholder in the company, and was one of the directors. While some of the rolling stock was marked with one or other names of the original companies, none of it had upon it the

corporate name of the new company.  On December 31, 1890, as appears from the minutes of the company, this resolution was adopted by the board of directors :

" Resolved: That the president be authorized to purchase the rolling stock owned by Philip Collins, and now in use on the railroad at its cost, less any payments made thereon, the said rolling stock to be held as security by Collins until fully paid for ; and that the funds available from the earnings for the year be applied to the payments to Philip Collins, on account of the rolling stock owned by him and used in operating the railroad."

Five days afterwards, on January 5, 1891, the company, by its president, and Collins, entered into a written agreement for a lease of the rolling stock to the company at an annual rental, with an option to purchase before the expiration of the lease. The paper starts out thus :

" Whereas, the said Philip Collins purchased at his own proper cost, amounting with interest and repairs, to $17,185.67, in the years 1886 and 1887, and let the same to the said party of the second part (the Railroad Company,) the following described rolling stock and equipments."  Then follows a detailed description of cars and locomotives corresponding to those in dispute, and then is this declaration :

" And whereas, the party of the second part (the Railroad Company), has had the use and benefit of said described rolling stock and equipments, without any definite annual rental therefor having been fixed and agreed upon."  Then follows the stipulation that, for the consideration thereinafter named, Collins agrees to lease all of the rolling stock to the railroad company, its successors and assigns for eight years from January 1, 1887, to January 1, 1895 ; and then follows this stipulation on part of the company:

" The said party of the second part (the Railroad Company), its successors and assigns, agree to pay the said party of the first part (Collins), his executors, administrators and assigns, an annual rental therefor of $2,500, payable quarterly at the end of each and every quarter from January 1, 1887."  It is then further stipulated that the company has the privilege of purchasing the rolling stock at any time during the term at the price of $17,185.67, with interest ; and should the purchase be

made, credit is to be given for amount of rent paid, as purchase money. The company paid Collins rents at different dates between February 21, 1891, and December 19, 1891, amounting to $10,542.67, for which he gave receipts, stating in them the money received was "on account of lease for purchase of engine and cars dated January 5, 1891." The lease was not acknowledged or recorded.

Default having been made on interest on the bonds, the mortgage was foreclosed by bill in equity against the railroad company, filed in the circuit court of the United States for the western district, and a decree of sale of the mortgaged property made, including engines, cars, and all equipment. The sale was advertised for December 1, 1891, at Philadelphia. A committee of the bondholders, Henry Whelen, R. Dale Benson and Francis M. Milne, was formed to bid on the property; it was knocked down to them, and by order of the court the trustee in the mortgage conveyed to them, and they conveyed it to the Bellefonte Central Railroad Company, this defendant, which, about January 1, 1892, took possession of the railroad and all the equipment.

Before the sale to the committee, Collins read aloud a notice to bidders of his claim to the rolling stock transferred to him by McLaughlin, and then leased by him to the railroad company. There was also some evidence, by correspondence and otherwise, of the recognition of his claim by Mr. Frazer, the president of the new company; but afterwards the company repudiated his claim, and asserted title to the property; thereupon, Collins issued a writ of replevin, and the company gave a claim property bond and retained possession. The plea of "non cepit and property" was afterwards put in, and on January 17, 1894, the case was called for trial. The facts proven were in substance as we have stated, except there was no evidence of payment of rental to Collins admitted; the offer of the defendant in that particular having been overruled. But two questions were submitted to the jury: 1. Was the contract between Collins and the company for leasing the property made in good faith? 2. If so, what was the value of the property, as that was the measure of damages? There was a verdict for plaintiff for $12,890.41. Afterwards there was a motion for a new trial, which the court, in an opinion filed, overruled, and entered

judgment on the verdict. Defendant appeals, preferring twenty-two assignments of error, four of them to rulings on admission or rejection of evidence, and the remainder to answers to points and charge of the court.

There was abundant proof in the case that Collins was the actual owner of the property claimed by him on his writ; there really was nothing even tending to contradict this proof. We speak now of the facts; not of the legal conclusion sought to be drawn from the description in the mortgage, and the neglect, under the act of July 5, 1883, to record the lease. It is uncontradicted that McLaughlin, the contractor, bought the whole of it and paid for it, for his own purposes, before the completion of his contract, and then transferred it to Collins. It never was property "acquired" by the railroad company, under the description in the mortgage, unless acquired by the lease from Collins; and the company, up until after the sale on the mortgage, never pretended to assert possession in hostility to Collins' title. Nor, if notice to the purchaser at that sale was given by Collins, as is uncontradicted, would the act of 1883 operate to divest his title. The resolution of the directors and the written lease, when read together, constituted a bailment, and such they were correctly interpreted to be by the learned judge of the court below. The alleged errors, in the first two and the fourth assignments, to the admissions of evidence on part of plaintiff, cannot be sustained. The evidence offered tended to prove full notice to bidders of Collins' claim, and that his right, after this defendant company was formed, had been recognized by its president; and further that, in the sworn report by the company to the secretary of internal affairs, was an implied disclaimer of title to this property. Not one, except the third, of the many errors alleged, is well founded; the rulings of the court are correct, and the reasons therefor sound, and there is nothing of merit in the assignments which calls for further notice; therefore, all except the third are overruled.

As to the third assignment, it will be noticed the plaintiff claimed damages for the taking and detention of the property in an amount equal to its value, $17,185.67, with interest. The defendant offered in evidence rental receipts attached to a duplicate copy of the lease of January 5, 1891, in its possession. These receipts amounted to $10,542.67. The form of these

receipts was the same in substance; this is a copy of the first in date:

"Received February 21st, 1891, from the Buffalo Run, Bellefonte & Bald Eagle Railroad Company, the sum of Five Thousand, Five Hundred and Forty-five Dollars and nine cents on account of lease for purchase of engine and cars.

"(Signed) PHILIP COLLINS."

The offer of defendant was of the lease with receipts attached, signed by Philip Collins, being stated " on account of lease for purchase of engine and cars." Then follows the purpose of the offer in these words:

"The purpose of the offer is to present upon the record to the court and jury what the defendants conceive to be the principal data, upon which to estimate and determine the damages due from the defendant in this action to the plaintiff, in case the court is of the opinion that the plaintiff, as against this defendant, has any right to recover at all."

To this offer plaintiff objected, for the reasons: 1. Because defendant denies plaintiff's title under the lease. 2. Defendant never declared the option to purchase under the lease. 3. The plea of non cepit and property is a denial of any payments under the agreement. The court then put this question to defendant's counsel: "Do you offer this paper as binding upon you?" To which counsel answered: "We offer it as showing what the contract was between the original parties to it, so that when the court comes to consider the question of damages, in case the court should differ with us as to the question, right here we have the evidence, from which the true measure of damages is to be determined from that issue." The court, being of opinion that as defendant had disaffirmed the lease, and claimed under a title paramount to it,—the mortgage; had not acknowledged it in any way, or offered to purchase under the option, the receipts were inadmissible, and the offer was overruled. Was this ruling correct?

The suit was replevin; the property had been seized by the sheriff, and defendant had given a bond, and then pleaded property. So far as the property itself was concerned, the plaintiff could not recover it. Replevin is a mixed action, in rem and personal. The defendant has his election to deliver the prop-

erty on the writ, or to give security and keep it.  If the property be delivered to plaintiff, the defendant is answerable in damages only for the taking and detention.  If it be retained, he is answerable for the full value.  As is said in Fisher v. Whoollery, 25 Pa. 197, " In either case, the action thenceforth proceeds for damages alone.  The property itself can in no event be recovered at law from the defendant; nor can he tender it afterwards in discharge of the action, or even in satisfaction pro tanto of the damages claimed. . . . Nothing but money can be recovered in an action on the defendant's property bond." So that the possession of the property itself was no longer an element in the case; it belonged absolutely to defendant; how much money, if any, ought defendant to pay plaintiff?  As the defendant had the property, and must keep it, that was the only question remaining.  To answer this, involved the determination of three other questions; if the property passed to the defendant under the description in the mortgage, it ought to pay nothing; but, we have already held, with the court below, that this position is not sustainable; if the interest of the Buffalo Run, Bellefonte and Bald Eagle Railroad Company in the property leased passed by the mortgage sale to defendant, then, when the writ of replevin issued, the latter had a qualified interest in the property, and such interest as it did not have Collins had, and ought to be paid for; if no interest passed under the lease to defendant, it ought to pay damages measured by the value of the property.

It is very clear to our minds that whatever right its predecessor had, by virtue of the lease, passed to this defendant. Assume that it wholly repudiates the claim of Collins, as one branch of its defense, why should that estop it from setting up the other?  If a landlord distrain for rent in arrears, and the tenant replevy the goods, the latter may not, at the trial, allege title paramount, and also set up payment of the rent; from motives of public policy, the law will not tolerate such repugnant defenses; if the entry was under plaintiff's title, whether good or bad, that created the relation of landlord and tenant, and the tenant must pay; if not under that title, he owes nothing, for he is not tenant to the holder of it.  But, in both ejectment and proceedings for the collection of rent, it has always been held that, while the tenant may not defend under

an outstanding or paramount title, he may show that during the term his landlord's title had ended by assignment or judicial sale; such defense is not repugnant to the original contract relation of landlord and tenant. So here, the plaintiff alleged a bailment with an option to purchase; there was no serious denial of it by defendant; but, it averred, by the mortgage of after acquired equipment, and the failure to record the bailment contract under the act of 1883, the mortgage clasped the bailed property, and it passed by judicial sale to the purchaser, absolutely; but defendant alleged further, even if it did not so pass absolutely, the special or qualified interest of the bailee, an interest measured by the amount of rental paid, at least passed, and the damages of plaintiff should be measured by the amount yet unpaid. This was, substantially, the position defendant took when it offered the receipts. In assuming these two theories of defense, there was nothing inconsistent with good morals or public policy, nor was there anything inconsistent with the issue framed. The judicial utterances, that a suitor will not be permitted to " stultify himself; " will not be permitted to "blow hot and cold in the same breath," and the like, have no application to the facts here.

There was a repugnant defense which the court below thought defendant might take if the receipts were admitted, and which would operate with hardship on plaintiff, and defeat a trial on the merits. In amount the payments made were all that were due under the contract up to date of suit, and therefore, if the suit had been instituted on the contract, it was prematurely brought; but, in replevin for wrongful detention, such claim on part of defendant would not have been tolerated at that stage of the proceedings. When Collins demanded his rights under the contract, defendant asserted absolute ownership of the property under the judicial sale. In view of this claim before suit brought, there would have been, at trial, such repugnancy between it and a plea of premature suit that the latter would not have been entertained. Defendant had positively and peremptorily denied any title in Collins to the property; he was thereby lured into an action to test his right. Equity would, in view of defendant's attitude, before suit brought, estop it from alleging at trial that suit was brought prematurely; it could not wholly repudiate his title before suit, and then at trial, defeat his ac

tion by a qualified acknowledgment of it.  Defendant did not take such position at the trial, and our remarks are prompted solely because the court below indicates this view as partly the ground of its rulings.

Take any one of these receipts on its face and what does it show ?  If the court had admitted them to be read to the jury as was the offer, it would have been bound, then, to say to the jury, this written receipt declares that the money paid is " on account of lease for purchase of engine and cars, dated January 5th, 1891 ; " this contract, with all these receipts attached, being produced by defendant, and by it offered in evidence, must be taken as true ; being so, it is a distinct, unequivocal recognition of the contract; and before suit brought, having given distinct notice to plaintiff that it repudiated liability under the contract, would neither pay rental nor the purchase money, he, the plaintiff, was not bound to wait until the period for declaring the option had expired, but could bring his suit at once. The measure of plaintiff's damages is the value of the property, as stipulated in the bailment contract mitigated by the amount already paid him by defendant's predecessors, as shown by these receipts.

This, it seems clear to us, was the ruling that should have been made on the offer of the receipts, and the interpretation that should have been put upon them by the court.

It was not important what significance was attached to them by counsel when the offer was made ; the purpose, clearly stated, was to mitigate damages ; that rendered them admissible ; once in evidence, if they were to affect the amount of damages, their purport was for the court.  Assume, that the offer of the receipts and their admission as a ground of defense would necessarily have been the destruction of the first ground, neither was inconsistent with the issue, for both tended to show property in defendant; the first, by a title absolute, under a sale which it was argued wholly divested plaintiff's title ; the second, by a special or qualified title in subservience to that of plaintiff.

The judgment is reversed, and a v. f. d. n. awarded.